DO NOT PUBLISH

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

08-255

STATE OF LOUISIANA

VERSUS

BILLY RAY VICE

**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 16911-05
HONORABLE RICK BRYANT, DISTRICT JUDGE

**********

J. DAVID PAINTER
JUDGE

**********

Court composed of Sylvia R. Cooks, J. David Painter, and Christopher J. Roy, pro tem, Judges.

AFFIRMED AND REMANDED WITH INSTRUCTIONS.

Harold L. Thibodeaux
1825 Hodges St.
Lake Charles, LA 70601
Counsel for Defendant-Appellant:
      Billy Ray Vice

Terri R. Lacy
Assistant Attorney General
P.O. Box 94005
Baton Rouge, LA 70804
Counsel for Appellee:
      State of Louisiana

PAINTER, Judge.

Defendant, Billy Ray Vice, appeals his conviction of extortion arguing that the evidence adduced at trial was insufficient to support a guilty verdict. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

Defendant and the victim, Ricky Fox, were both seeking the position of Chief of Police for the City of Vinton, Louisiana in the April 2005 election. Defendant was the incumbent Chief of Police, and the victim was a longtime trooper with the Louisiana State Police. On or about January 20, 2005, Defendant sent or caused a letter to be sent to the victim which threatened to expose several crimes and ethical violations allegedly committed by the victim to the newspaper and throughout the community should he choose to run for the office.

On April 13, 2007, a jury found Defendant guilty of one count of extortion, a violation of La.R.S. 14:66. On August 6, 2007, he was sentenced to five years hard labor, suspended, two years supervised probation, and one hundred days community service. Defendant filed a motion to reconsider the sentence. The motion was denied in open court on October 4, 2007.

Defendant has perfected a timely appeal. His sole assignment of error is that the evidence was insufficient to support the conviction.

1

**DISCUSSION**

*Errors Patent*

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find that there is one error patent and one possible error patent.

First, a possible error patent resulted from the trial court ordering Defendant to pay the costs of the proceeding within the first six months of his probation. However, we find this payment to be analogous to the restitution provision found in La.Code Crim.P. art. 895.1(A)(1). As such, we find that the trial court has great discretion in ordering payment in either a lump sum or monthly installments. Thus, we view the trial court's order as imposition of a lump sum payment that is due within the first six months of probation. Therefore, the order does not constitute error patent on the face of the record.

Next, the record does not indicate that the trial court advised Defendant of the prescriptive period for filing post-conviction relief as required by La.Code Crim.P. art. 930.8. Therefore, the trial court is directed to inform Defendant of the provisions of article 930.8 by sending appropriate written notice to Defendant within ten days of the rendition of this opinion and to file written proof that Defendant received the notice in the record of the proceedings. *State v. Roe*, 05-116 (La.App. 3 Cir. 6/1/05), 903 So.2d 1265, *writ denied*, 05-1762 (La. 2/10/06), 924 So.2d 163.

*Sufficiency of the Evidence*

Defendant argues that no physical evidence was given that would have linked him with the letter, that it was arguable whether the letter even constituted extortion,

2

that the case against him was circumstantial, and that the State failed to dispel every reasonable hypothesis of innocence.

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody,* 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witness. Therefore, the appellate court should not second-guess the credibility determination of the trier of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See King*, 436 So.2d 559, citing *State v. Richardson*, 425 So.2d 1228 (La.1983).

*State v. Lambert,* 97-64, pp. 4-5 (La.App. 3 Cir. 9/30/98), 720 So.2d 724, 726-27.

> Further, when the conviction is based upon circumstantial evidence, La.R.S. 15:438 provides that such evidence must exclude every reasonable hypothesis of innocence. *State v. Camp,* 446 So.2d 1207 (La.1984); *State v. Wright,* 445 So.2d 1198 (La.1984). However, La.R.S. 15:438 does not establish a stricter standard of review on appeal than the rational juror's reasonable doubt standard. The statute serves as a guide for the jury when considering circumstantial evidence. On appeal, the issue is whether a rational trier of fact, when viewing the evidence in a light most favorable to the prosecution, could find that all reasonable hypotheses of innocence were excluded.

*State v. Dotson,* 04-1414, p. 2 (La.App. 3 Cir. 3/2/05), 896 So.2d 310, 312.

Defendant was charged with one count of extortion, a violation of La.R.S. 14:66, which provides:

> Extortion is the communication of threats to another with the intention thereby to obtain anything of value or any acquittance, advantage, or immunity of any description. The following kinds of threats shall be sufficient to constitute extortion:

> (1) A threat to do any unlawful injury to the person or property of the individual threatened or of any member of his family or of any other person held dear to him;

3

(2) A threat to accuse the individual threatened or any member of his family or any other person held dear to him of any crime;

(3) A threat to expose or impute any deformity or disgrace to the individual threatened or to any member of his family or to any other person held dear to him;

(4) A threat to expose any secret affecting the individual threatened or any member of his family or any other person held dear to him;

(5) A threat to do any other harm.

Extortion is a specific intent crime. "Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La.R.S. 14:10(2). Specific intent may be inferred from the circumstances of transactions and actions of the accused. *State v. Robertson,* 98-883, p. 6 (La.App. 3 Cir. 12/9/98), 723 So.2d 500, 504, *writ denied,* 99-658 (La. 6/25/99), 745 So.2d 1187.

At trial, the following testimonies were given:

Chad Porterfield was a detective with Vinton Police Department at the time of the incident which resulted in the current trial. He testified that he knew Defendant prior to Defendant's appointment to the position of Chief of Police by the Vinton City Council. He further testified that he knew Fox, who was later elected to the position of Chief of Police. He stated that in 2004, a few months prior to the election, he and Defendant were driving in a Christmas parade. He stated that Defendant saw Fox standing along the parade route and that Defendant made the comment "that he could make one phone call and have Fox crucified." Officer Porterfield was demoted from detective to patrol officer shortly thereafter. He believed it was because he was friendly with Fox. He testified that Defendant told him he could not visit Fox at his

4

home while he was driving a police unit. At the time of the trial, Porterfield was assistant to Fox.

On cross-examination, Porterfield stated that he knew and worked with Fox when Fox was a state trooper. He admitted that at the time he was demoted, Defendant told him that it was because of the way he had mishandled some cases. He described two particular cases which Defendant said that he had mishandled. Porterfield stated that he secretly taped a conversation he had with Defendant and turned the tape over to the Federal Bureau of Investigation. He asserted that when he first saw the letter, shown to him by Fox, he did not suspect it was Defendant who wrote or sent the letter.

Fox took office as Chief of Police for the City of Vinton in July 2005. He testified that he received the letter around the last week in January 2005. He was not actively campaigning at the time he received the letter. He stated that he was threatened by the letter, particularly for his family. He gave the letter to the Federal Bureau of Investigation the next day.

On cross-examination, Fox stated that he believed that Defendant sent the letter and that some of the information in the letter was given to him by Ken Delcambre, who was a commander for the Louisiana State Police for several years when Fox was a trooper.

Joe Duenas, a special agent for the Federal Bureau of Investigation, testified that he opened the investigation on February 5, 2005. He stated that Defendant was the primary suspect in the case. He sent the letter and envelope for analysis, but no usable fingerprints were found on either. He enlisted the help of Arthur Phillips, an

5

officer with the Vinton Police Department. He supplied Phillips with a recording device and instructed Phillips to get Defendant to talk about the letter. Two recordings were made, one on March 11, 2005, and one on March 21, 2005.

Duenas testified that on April 5, 2005, he conducted an interview with Defendant concerning the letter. He stated that Defendant voluntarily spoke with him. He testified that Defendant stated three times that he wrote the letter but also stated that he had no knowledge about who may have written or sent the letter. Defendant also suggested that he knew who wrote and sent the letter but that he could not tell. Duenas stated that because of this interview, his suspicions were raised and he pursued the investigation. Shortly thereafter, he received "information regarding a possible person who might have provided Mr. Vice with the information contained in the letter." That person was Captain Ken Delcambre. In June 2005, the special agent interviewed Delcambre, who confirmed that he had faxed Defendant some of the information that was contained in the letter.

On cross-examination, Duenas stated that Defendant told him first that he received a copy of the letter from the mayor of Vinton but then later stated that he received a copy anonymously. Duenas said that thereafter he spoke with the mayor and the mayor denied giving a copy of the letter to Defendant or even telling Defendant about the letter.

Kent Peveto, a trooper with the Louisiana State Police, testified that he accompanied Duenas to the interview with Defendant and Delcambre. His testimony corroborated the special agent's testimony.

6

Officer Arthur Phillips testified that he had known both Defendant and Fox for several years and had good working relationships with them prior to the election. Duenas contacted him and convinced him to wear a wire and to attempt to discuss the letter with Defendant. Phillips testified that Defendant told him that he wanted to somehow get the allegations in the letter into the paper so that "the public can be aware of what Fox was doing. . . .basically discredit him on his running for office."

At trial, the State played portions of the March 5, 2005 recording of the conversation between Phillips and Defendant. Because the recording was not very clear, Phillips commented on each portion as the prosecutor played the recording. His comments indicated that Defendant talked about matters in the letter and wanted Phillips to see if he could influence a newspaper writer to publish negative articles about Fox. He further indicated that Defendant stated that he got the letter from the guy who wrote it. Phillips testified that Defendant eventually showed him the letter, which looked like a copy of the letter Agent Duenas had shown him, and that Defendant stated that only he and the person who wrote the letter knew about it.

On re-direct examination, Phillips stated that he tried to get Defendant to tell him who wrote the letter but that Defendant would only tell him that "it was only him and the person that actually had written the letter was involved."

Defendant testified that he told Porterfield that he had heard things about Fox from other chiefs and not "one of them had anything good to say about Mr. Fox." He said that the mayor had called him and told him about the letter, but nothing concerning the contents. He stated that he received a copy of the letter in the mail a few days later. He stated that he assumed that Delcambre sent him the copy of the

7

letter because he recognized some of the allegations the captain made about Fox. Defendant said that Delcambre sent him a message via a mutual friend to call him because he had information about Fox. After a few phone calls, Delcambre sent him a fax containing some of the allegations that were in the letter. Defendant stated that several of the items listed in the letter as being criminal or ethical violations committed by Fox were told to him by Delcambre, but that there were several items listed that he knew nothing about.

As for the interview with Duenas, Defendant explained why he told the agent that he wrote the letter as follows:

> A. He asked me if I had ever seen that letter and I told him, I said, "No, I sure haven't. I never seen that before," because they had done made me mad then, and so I said, "No, I can't lie to you all," I said, "Yeah, I've seen that letter." I said, "I have a copy of it myself," and he said, "Oh, yeah?" He said, "Did you write that letter?" I said, "No, sir, I didn't," and he said, "You're lying to me." He said, "We know you wrote that letter." And I said, "Okay, if you said I wrote the letter I wrote the letter."

At trial, Defendant denied that he wrote the letter or caused the letter to be sent to Fox.

In brief, Defendant argues that the evidence was insufficient to support a conviction for extortion. He argues that there was no proof that he wrote the letter, caused the letter to be sent, or that the letter constituted extortion.

In the view of this court, the letter constituted a threat involving Fox's decision to run for a public office, as set forth in the above definition of extortion. In pertinent part, the letter stated as follows:

> "WE GOT MORE[.] WE JUST THOUGHT WE WOULD GIVE YOU A LITTL[sic] TASTE OF WHAT WE GOT[.] WE WILL PROBABLY SEND A COPY OF THIS TO EVERYONE THAT SUPPORTS YOU[.]

WE DON[']T THINK IT WILL DO ANY GOOD TO SEND THIS LETTER OUT UNTILL[sic] AFTER YOU START RUNNING. I KNOW ALL THE LOCAL CHURCHES AND WOMEN[']S GROUPS AND OTHER POLITIANS[sic] SUCH AS THE CHIEF, MAYOR, AND ALDERMAN WOULD LIKE A COPY.

In *State v. Sharlhorne,* 554 So.2d 1317(La.App. 1 Cir. 1989), *writ denied,* 559 So.2d 1365 (La.1990), the first circuit examined what constituted specific intent to communicate a threat. Sharlhorne, recently released from prison, approached two shopkeepers asking for money. The accused told the shopkeeper that "something might happen--people that give me money, things don't happen to their building." The first circuit found this implied threat sufficient to sustain the jury's verdict of attempted extortion, stating: "Having proved all the elements of the greater offense of extortion, the evidence was clearly sufficient to prove defendant's guilt of the lesser and included offense of attempted extortion." *Id.* at 1323.

As in the discussion in *Sharlhorne,* when the author of the letter stated that "[w]e don't think it will do any good to send this letter until after you start running," the letter clearly implied that should Fox choose to run for the office, the allegations would be publically disclosed.

Further, encompassed in proving the elements of the offense is the necessity of proving the identity of the perpetrator. Employing the *Jackson* standard, the state is required to negate any reasonable probability of misidentification in order to carry its burden of proof. *State v. Sampson,* 95-58 (La.App. 5 Cir. 5/30/05), 656 So.2d 1085, *writ denied,* 95-1665 (La. 11/27/95), 663 So.2d 730. There was no direct proof of the identity of the author in the current case.

The letter may have given an indication of the author, or authors. The letter began as follows:

MR. FOX[,]
WE ARE GLAD THAT YOU ARE FINALLY GIVING US THE OPORTUNITY[sic] TO PAY YOU BACK FOR SOME OF THE THING THAT YOU HAVE DONE TO SOME OF YOUR FELLOW TROOPERS OVER THE PAST YEARS. EACH WEEK WE ARE GOING TO PUT AND[sic] ADD[sic] IN YOUR VINTON NEWSPAPER[.] WE ARE GOING TO START OFF THE FIRST WEEK LIKE THIS.

However, at trial, Delcambre testified that he received a call from Defendant. He stated that:

A. He wanted to know from me if I had any information about any of Ricky Fox's wrongdoing. He had heard from other troopers that Ricky Fox had been involved in a lot of problems when--when I was troop commander with State Police.

. . . .

A. If I recall, back and forth with phone calls, calling me and then he'd leave messages and when I could I'd call him back. I told him, I said, "Look, I'm going to write certain things on a --on a paper, and I'll fax you the information."

Delcambre testified that he faxed a handwritten list of information on January 14, 2005, to Defendant.

At trial, Defendant admitted that he had information that could damage Fox's reputation and told Porterfield that he had it. He admitted that he had talked to Delcambre in an attempt to garner information regarding Fox. He admitted that Delcambre faxed him some of the information that was contained in the letter sent to Fox. Fox testified that he received the letter on January 20, 2005. Defendant stated that he obtained a copy of the letter within a few days of the letter being received by Fox.

10

Duenas and Peveto both testified that Defendant told them several times that he had written the letter but that Defendant later recanted his admission. Defendant stated that he only responded to the accusations of Duenas as he did because he got angry and that he did not really mean what he said. Duenas testified that Defendant initially told him he learned about the letter from the mayor but that the mayor told the special agent he did not tell Defendant about the letter.

Phillips testified that Defendant wanted him to contact the *American Press* newspaper and to try to have the information contained in the letter published. Phillips stated that Defendant indicated to him that he knew who wrote the letter and that he was protecting the person. The officer said that when Defendant finally showed him a copy of the letter he was very secretive about it, keeping the copy at home and then showing it to him outside the police station.

Defendant denied that he wrote the letter and said that he did not know who did. He further denied that he sent the letter to Fox.

Taken in a light most favorable to the prosecution, the circumstantial evidence was sufficient to sustain the verdict beyond a reasonable doubt that Defendant wrote the letter or caused the letter to be written and sent to Fox. The jury had the benefit of seeing the witnesses and hearing their testimonies and chose to believe that Defendant was responsible for the letter. It was the role of the jury to weigh the respective credibility of the witnesses, and this court should not second-guess the credibility determination of the jury beyond the sufficiency evaluations of the *Jackson* standard. *Lambert,* 720 So.2d 724.

11

**CONCLUSION**

Defendant's conviction and sentence are affirmed. The trial court is directed to inform the Defendant of the provisions of article 930.8 by sending appropriate written notice to the Defendant within ten days of the rendition of this opinion and to file written proof that the Defendant received the notice in the record of the proceedings.

AFFIRMED AND REMANDED WITH INSTRUCTIONS.